Elizabeth Farrell My name is Elizabeth Farrell from the firm of Finnegan on behalf of TBL Licensing, also known as Timberland. With me at Council's table is Mr. Troy Vigier. The District Court's decision should be reversed and remanded with directions to enter judgment in TBL's favor to register the icon boot design as a trademark. At first, I'd like to focus on what it is TBL is asking for. TBL is asking for a registration of the entire mark. This is the pictures and description shown of our opening brief on pages 24 and 25. Troy Vigier I want to let you go into that. I just want to make sure of one thing at the outset. They're cross motions for summary judgment and lots of times when we're looking for summary does I understand that the parties agreed to submit this to the court so it's almost like we have a bench trial and we're reviewing this for clear error. Is that standard review where we are? Katherine Vidal That's exactly correct. Judge Hilton was looking at presumption or preponderance of the evidence and that's the findings that he made. Turning to that question, it is TBL's burden here today to show two things and we think that we've met both of those burdens. First, on non-functionality, the court erred as a matter of law in not considering the icon boot design as a whole when making its determination under the Tools USA case. The court also erred for not applying all four factors, which are sometimes called the Morton Norwich factors, which this court applied in the McGarrelades case to the whole design. This is simply not how the district court saw it in this case. Looking at the very first page of the district court's opinion, it says that TBL was, quote, seeking registration of eight specified features, end quote. That's at JA78. That is simply not what TBL is asking for. TBL filed one trademark for one trademark registration on the entire design. It is not eight trademark registrations on eyelets and quad stitching and love souls. It is not that. It is one design. With that backdrop, the court continued to discuss each of the features at length, which we know under CTB is okay as long as you return to the entire design, which this court didn't do. My colleague on the other side points to JA90 and 91 as the place where the court did this analysis of the whole. That's simply not on those pages. In fact, if you look at those pages, the court referred to the elements of the design or design separate times just on page JA91. There is no analysis of the whole, and that is an error as a matter of law. What do they have to do? I agree that the bulk of the analysis is on the component design features, but on JA91, it does say as a whole. The court uses that language. It doesn't then do additional lengthy analysis. What's the basis of . . . if the court says it's doing it as a whole, what's the basis in a civil case like this that obligates it to be a more robust discussion? We have those cases in certain areas of the law where we say you got to do this or that, so we have enough. It's got to be a certain type of discussion. Is there something here that says if they say they're doing it as a whole, that we don't take the district court at its word, that we need more in order to do that? Your Honor, what I recall on page JA91 is the as a whole is preceded by something along the lines of the claimed features of the design as a whole. If you read that sentence in its totality, the court is still talking about the individual features. This is not just on those pages. There are other sites, JA80, 94, and 97. It goes from stem to stern. It starts off talking about the eight features and it ends talking about the eight features. That's on page JA101. The court concludes by saying that TBL failed to carry its burden to prove that these eight features are non-functional. There just is not an analysis of the whole. I direct you to the CTB case where the court goes to the brand owner's patent, finds a discussion of the second part, and then specifically discusses how these two pieces in a functional way relate to one another, and as a result, finds that design functional. That's the first legal error, that the court didn't consider the design as a whole. Turning to what we believe the second legal error is, is that the court didn't consider all four factors. Under the McGarrelades case, the Fourth Circuit has noted that often the four factors are This is important because in McGarrelades, the court also points out that traffics doesn't mean that you skip the last two factors. I know that that's my colleague on the other side's position, but I think that could be true in a situation where you have clear functionality after looking at the first two factors. We don't have that in this case. There's not . . . Then our inquiry is whether saying that was clear error. Would you agree there? You may disagree, and maybe you're right there. Maybe it was clear error, but that's what we look at that issue for. Your Honor, we disagree on that point, but if you look at those first two factors, the district court still got it wrong. Remember, the focus is on the icon boot design as a whole. I'm sorry to cut you off. I just want to make sure what you said you disagreed with me on. Your Honor, we believe that the district court should look at all four factors. Okay. You disagree that traffics allows you to do it if it's clear. You've got to go through all four no matter what. Yes, Your Honor. Then you're saying even if you're wrong there and traffics does allow that, there's clear error in saying there was enough from the first two factors? Correct. That's because there is no patent that claims that the entire icon boot design as a whole is functional. There is also no advertisements that claim the icon boot design as a whole is functional. My colleague on the other side points to advertisements that talk about waterproofing, for example. Waterproofing is a lot of things. It is not the icon boot design. It is the material that the boot is made out of. It is the way that the boot is constructed. In fact, we have evidence from our expert that the quad stitching is actually counter to waterproofing because it's a bunch of extra holes that are made in the side of the boot, and it's much harder to make a boot waterproof after you've put a bunch of extra holes in it. So, Your Honor, we also believe, moving to the third factor, that the record is replant with alternative designs. We have an entire volume, actually, of our joint appendix that's devoted to that. And then finally, there doesn't seem to be much dispute that the icon boot design is more expensive, harder to make, and less efficient to manufacture than other designs. Your Honor, I'd like to move on to the secondary meaning issue, if there's no other questions about functionality. On the issue of secondary meaning, the district court's holding was also clearly erroneous. TBL recognizes this is a heavy burden to leave the court with a definite and firm conviction that a mistake has been made. But under the Fourth Circuit's Perini test, the court should have considered the totality the evidence. Your Honor, volumes three and four of the joint appendix are devoted to over a thousand Instagram posts. We believe this is direct evidence of secondary meaning. These are where people have identified the Timberland boot in the comments. They've called it Timberland. They've called it Tim's. And not only do we have a thousand comments, we have over 17 million likes of those comments. This is direct evidence of secondary meaning. This is unusual and pretty remarkable, and it was not discussed once by the district court in its opinion. The district court makes one reference to social media posts, and that is in the context of the Yellow Boot Declaration. The Yellow Boot Declaration is from 2014. These Instagram posts are from 2021. There's no way that Mr. Frisk from Timberland could have been talking about these Instagram posts in the remarks that he makes in that boot declaration. Can I ask a question about this distinctiveness analysis? Yes, Your Honor. I think I'm right here, but please tell me if I'm not. Is it correct that to establish this distinctiveness, that you are limited to the design features that you claim in your application? In other words, you have certain features that you say are not functional, and we moved on from that. But those are the features we are looking at to say whether those features, individually or as a whole, create this distinctiveness. In other words, you don't get to move to distinctiveness and look to things that are functional in the design. So Your Honor, we're not asking that the eight individual features are found to have achieved secondary meaning. We're asking for the entire icon boot design as a whole. So that's the picture, and the picture is aided by the description, but it is the whole thing. And so when you look at secondary meaning, you also need to make sure that you're looking at the entire configuration and not the eight individual features. But to your question, we don't believe that any of the features are functional. And because you're not supposed to slice and dice the icon boot design or the proposed apply for design, I don't see how you can change the design and then ask, change the design meaning take out a section because you decide it's functional. Like you say, okay, we decide the eyelets are functional. We're going to not think about the eyelets and then go look at secondary meaning. That doesn't make sense because now you've changed the design. You need to focus on the full design and then look at the evidence that we have, both circumstantial and direct, as to the consumer's association with that design. You may have answered it. I just wanted to be sure. I mean, I take your argument to be that you're entitled to trade dress protection and the design features that you're claiming aren't functional. And for example, you're talking about on the sole, you're not really talking about the undersole and how it may appear. And are you, is that when you get to distinctiveness, do you agree that you don't get to consider parts of the design that you said you're not claiming in this trade dress application? Yes, Your Honor. We wouldn't, if we were to have another feature that was not part of the trade dress, I don't think it would be appropriate to, if people had consumer associations about that feature that's not part of the trade dress, I don't think that that would count. I got you. So you can't like disclaim the functional parts on the first prong and use them in the second prong. You agree with that? Correct, Your Honor. Okay. So, and just returning for a moment to the Instagram evidence, we think that this evidence is more powerful even than a survey, because it's not artificial. It's organic, it's spontaneous, and as we said, this is quite uncommon evidence to have, but the district court completely ignored this evidence, and the PTO actually ignores this evidence in its brief as well, which we've pointed out in our brief, but they still have not responded on that. And so we think that this, if it's a totality of the evidence inquiry, then you should look at all of the evidence, and to ignore an entire category of direct evidence, we believe is clear error alone. Another area that I'd like to discuss about the evidence was that the court gave a lot of weight to the third-party boots, and at one point, the district court declared that the market was saturated with third-party boots and that this was fatal to TVL's argument. We think that this lacks factual basis. The PTO put in evidence of thirty-nine boots that it said were third-party evidence of using the same design. Now, we first of all take issue with that. We don't think some of them were substantially similar, which is one of the requirements of the test, but also, there's absolutely no information about market impact. There's no information from the PTO about how long these boots were sold for, how much money they made from them, how much impact they had on the marketplace, and actually, the evidence we have is that, as opposed to being a sea of similar boots, we have evidence that the market is actually quite large for these boots. The expert in our case alone, from one website, found two thousand boots, so thirty-nine boots from one website that have two thousand boots. That's a pretty big ocean for these thirty-nine boots to be sort of floating around in. There's just no evidence of market impact, and the court shouldn't have credited the third-party evidence so heavily when the test is not, does some of these boots exist? The test is, what's the impact that this is having? From a public policy standpoint, that really makes sense, right? Timberland is trying to run a business, so if someone posts a boot on a website, it stays up for a couple of weeks, it goes down again, it doesn't appear to have any market impact. They have bigger fish to fry. They have other things that they're doing, so there is not a case, and this is similar to the Cone case, which I recognize is per curiam, and it's not precedential, but I do think it explains the logic behind this, that the importance of the third-party evidence is when that evidence has an impact on the marketplace. So, to that end, we think that the district court's statements about allowing TVL to have this registration, that that being anti-competitive, we think that that's not true. The particular configuration that we're asking for is very particular, and so would it keep other parties from selling that boot? It would, but we think that that actually represents a protection for the consumer. I'll reserve the remainder of my time. Thank you, Ms. Farrell. Ms. Hebra. Good morning, and may it . . . actually, good afternoon, and may it please the Court. The district court did not commit any error here. It performed a proper legal analysis, particularly under this Court's precedent in CTB, where the analysis in CTB, on the whole, was really no more than a couple of sentences itself, and the point of that case was to say, look, if we have a combination of functional features, we need to see something that is arbitrary in the design choice, an ornamental feature, something other than just putting these elements together in a way that they perform their intended function and make that product, that the resulting product is, here a boot, more useful. In this case, what the district court found, and it did not need to say more, was that as a whole, all these features in the boot, as a whole, do what they're meant to do. They make it comfortable, they make it durable, they make it waterproof, and they make it for its intended uses, which TBL has touted to be as a working, for hiking, or any other purpose that you wish to use it for. This is an unusual case, because every feature that they have in the trademark application has been, at some point in the past, the subject of a patent as it relates to boot construction. I do want to just touch on . . . How many are for their own patents? How many features relate to Timberland Patents? I think there's two of their own patents in the record, and I did make some notes to myself on that. Nothing claims the entire boot, but it doesn't need to. That is not a requirement of the law, that there be one patent that claims everything, and I think that would be impossible in this case, because some of this knowledge of how you put a boot together with these features goes back to the early 1900s. But what you do need is just patents that teacher disclosed the benefit of the feature, okay? And if we have that, that is evidence of that feature's functionality, and there are countless patents that the district court went through, each one incited to them, and they're all in the record of the joint appendix. We had an expert, Ian Watley, who discussed each one of those as well, and the court said, all right, well, every feature's functional. I don't see anything that isn't functional in the whole. The lug soles, they're put on the bottom of the shoe to aid in traction, and it's the sole that isn't even proprietary to TBL. I think your colleague would say they intentionally did not include the bottom of the sole. They include, I call it the sidewall, but the side of the sole, and the two-tone color and the etching on there, and so it seems to me there are two issues that come from that, and similar to the ankle collar. They say, hey, the interior part of that has function. The outside doesn't. I guess two questions that flow from that that I'd like you to answer. One is, when you have a component like a sole, can you extract the sidewall from the part that's functional? Is that legally something that's permissible? Then number two, it seems like there's an issue of the more you claim the tread dress based on non-functional parts, the harder it is to prove distinctiveness. In other words, they affect one another. It would seem to me the more Timberland says, hey, I'm not looking at that tread pattern and the function that it does. I'm looking at the sidewall. It's harder to say, well, because of the tread as part of the design, it's distinctive. So I'm going to ask two questions. Do they make sense? Do you understand what I'm asking? I think they do, and I think it maybe helps if I just back up for a moment to kind of explain, because it's a little bit different when we're looking at an application to register a trademark than it might be in an infringement case. Yes, you've got to specify what the elements of your trade dress are, but for the office, you cannot, we're not allowed to issue a registration to somebody on the functional elements. So that's why we're doing an element-by-element analysis initially to see, okay, what's functional here and what isn't? Then we have to look at the whole, because it is possible, and we're not here to say that it isn't. First of all, footwear designs are not, per se, unregisterable, okay? But we take each case on its own, and we look at the evidence in that case, look at what the design is, and Timberland here is claiming eight features that they say are what their claim trade dress is, that that's what consumers look to to distinguish their boot from others, and that's what they should receive trademark protection. A whole boot, but these features are what distinguish it from anybody else. They're not seeking to register the silhouette of a boot, which I'll get to this in a moment, but that's a lot of what their social media evidence would show, not the features that they're saying actually are the means by which consumers are identifying and distinguishing TBL as a source. So on the lug sole particularly, right, it is the appearance, trade dress is the appearance, but that is dictated by the sole. TBL here did not add anything to those notches other than what exists because of the traction that they're providing as the sole of the shoe. So I don't know if that answers your first question. It is relevant that it's aiding in traction, whether or not you see the teeth marks on the side or not. And yes, it's also true that it would be strange that a feature that anybody should be allowed to put on their boot and can, because again, this sole is, TBL touts it as being a Vibram Camerata sole. It's not proprietary to them. So that certainly can't be the basis of acquired distinctiveness. And I do take counsel's point that you're looking at the whole, but if that's the reason that consumers are thinking it's a TBL boot, that can't be the reason that they could show they've acquired distinctiveness. But I do want to also just mention about the district court's reasoning here. The court cited to CTB, the court cited to Trafix, the court cited to Becton Dickinson, all of which say, if you find functionality based on something in patents or something in advertising, you do not need to look further. And the reason for that is simple. This is not about whether other designs are more functional or maybe better than yours. The issue is, does this boot work better? Are these features essential to its use or purpose in the form that they have it, in the design they did? And everything here is simply functioning to perform its function in a boot. The stitches are not arbitrarily placed. They hold the upper and the lower together. The U-shaped around the vamp is attaching the vamp to the upper in a way that's been known since the 1920s in the art. That's the problem that we have here. There's nothing arbitrary or ornamental about this combination. So therefore, the whole thing is functional, and the district court was correct to find it. They did not need to go on and say, we don't see anything arbitrary or ornamental. That might have been nice to show more, but we don't think it was necessary in this case. As to the advertisement, it appears the district court looked at old advertisements, and I know she's referenced the matters on social media. Should the district court have considered current advertisements? Because there does seem to be some shift in advertisements, and I believe there's one or two in there, from discussing the actual boot to just having the boot for marketability, I guess. Right. Okay, so we're turning to the secondary meaning now. The court, we have to assume, because the court said it did, right? All the evidence before it, it looked at everything. The fact that it didn't discuss everything in its opinion is not error. It was entitled to, as it did here, look at evidence of, has TBL shown it has substantially exclusive use of this design in the boot marketplace? My colleague on the other side wants to distract you and point to, well, the boot market has thousands of boots. It's entirely irrelevant. The standard for secondary meaning is substantially exclusive use of the design that they're seeking to register, and we put forward at least 39 examples of substantially similar boot designs that are on the market. We didn't need to prove up what their market penetration is. The mere existence of them is enough to put a roadblock to their claim to substantially exclusive use, and if they wanted to say, oh, well, that webpage, I can't even find it anymore. That was on them to come back and do that. That is certainly the case in examination before the agency. There is no way for an examining attorney to depose a third party or get information about market share or sales from anybody. We look at what is in the marketplace, publicly available, like any consumer does today. You go on the internet. If I'm shopping for boots, I'm on a boot website. These are all available for purchases. Many of them have identical features, and they've been on the market for a long time. They're offered under very well-known brand names, and we noted that in our brief, like Carhartt and Dunham and many others, and there's examples of them in the record. I think we only put the photographs from counsel's declaration in the record, but at the district court, all of them were there, so that's fatal. If you can't show substantially exclusive use of the design for what you're seeking to register it, you really don't need to look at more, but the district court did. The district court also looked at their advertising, and it looked at their social media posts, and the problem with the social media posts, whether they're today or old, what the court highlighted, I think, is still correct. The color yellow is a means by which people might view the boot as a TBL boot. It's not part of this application, and so if they're looking to other features as means to identify TBL as the source, it's not telling us anything about the design that they're seeking to register here today, and that design, if they get the registration, will allow them to enforce that design, not just the identical one, but boots that look similar. So where do we draw the line? If it has two rows of stitching, is that something they couldn't go after? The test for infringement is likelihood of confusion, and so what we're concerned about preventing here is a deterrent to competition, and we have evidence that there are lots of people already out there. In fact, TBL's own ads have said there are many imitators. It didn't seek to enforce against those imitators. It has great market share because it's a popular boot. It makes a good boot, and we're not saying that they don't, but consumers distinguish it for other reasons, including the TBL mark and their tree, the Timberland mark and their tree logo on the boot, and the social media posts, many of those contain the tree logo. How are we to know that when people are saying, look at those Tims, they're not pointing to that? I don't think it was error for the district court to have not discussed that evidence because it's really not probative of what they needed to show here, which is that . . . . . . Counsel, this is a question. You were in the office there, and there's an examining attorney, and then there's the board decision. We look at this de novo. Is what the examining attorney did and what the board did have any evidentiary value? I don't think it has any. We don't give deference in this area of the law to it. Can you tell me what, if any, significance there is, and maybe none, to what the examining attorney and the board did? That is an interesting question because these are interesting kinds of cases. They're kind of a hybrid. They're not purely new because you don't ignore what happened at the agency, but as you said, Your Honor, you don't defer to it when new evidence is brought in. For example, if the agency had made a finding, the examining attorney or the board, and it wasn't challenged on appeal, that would get substantial evidence review because nobody has done anything to change the evidentiary nucleus. What happened at the agency is the evidentiary nucleus. The agency made a determination based on the evidence that we had. In district court, when you put in new evidence, then it is on the district court to look at everything and make a determination de novo on the full record that the court has. So when the agency doesn't have the same record before it, so findings that the examining attorney made based on the limited information that she had, they don't really matter in this case. But I would say even there, she still found, even if she had noted that she thought, probably because she did not have the same evidence that we were able to deduce here, that some of the features might not be functional. She still found the whole design functional. And that's the point. The whole design is functional. There's nothing about this that isn't dictated by the function of the components. It results in a good boot that's good for hiking and construction. . Yes. .
judges: Roger L. Gregory, A. Marvin Quattlebaum Jr., DeAndrea Gist Benjamin